```
 1                    UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF VIRGINIA
 2                        ALEXANDRIA DIVISION
   _____
 3
                                  )
 4   UNITED STATES OF AMERICA,     )
                                   ) Case No. 1:13-mj-182
 5           v.                    ) Alexandria, Virginia
                                   )
 6   ERIC HARROUN,                 ) April 8, 2013
                                   ) 10:41 a.m.
 7           Defendant.            )
                                   )
 8   _____

 9


10                        TRANSCRIPT OF HEARING

11               BEFORE THE HONORABLE IVAN D. DAVIS

12                 UNITED STATES MAGISTRATE JUDGE

13


14


15


16


17


18


19


20   APPEARANCES:

21   For the United States:   Carter H. Burwell, Esq.
                              Andrew Peterson, Esq.
22
     For the Defendant:       Geremy C. Kamens, Esq.
23                            Gul R. Gharbieh, Esq.
                              Defendant Eric Harroun, in person
24
     (Proceedings digitally recorded by the FTR system.)
25
```

1                        P R O C E E D I N G S

2              THE CLERK:  *United States of America v. Eric Harroun*,

3    Case No. 13-mj-182.

4              MR. KAMENS:  Good morning, Your Honor.  Geremy Kamens

5    on behalf of Mr. Harroun.  With me is Gul Gharbieh.

6              THE COURT:  Good morning.

7              MR. BURWELL:  Good morning, Your Honor.  Carter Burwell

8    and Andy Peterson for the United States.

9              THE COURT:  Good morning.  This matter is before the

10   Court on a joint preliminary and detention hearing.

11             Are the parties ready to proceed?

12             MR. KAMENS:  We are.

13             MR. BURWELL:  Yes, Your Honor.

14             THE COURT:  The government may call your first witness.

15             MR. BURWELL:  Your Honor, the government calls Special

16   Agent Paul Higginbotham to the stand.

17                        **PAUL HIGGINBOTHAM**,

18                after having been duly sworn or affirmed,

19                took the stand and testified as follows:

20                        **DIRECT EXAMINATION**

21   BY MR. BURWELL:

22   Q.  Would you please state and spell your name for the record.

23   A.  My name is Paul Higginbotham.  P-A-U-L,

24   H-I-G-G-I-N-B-O-T-H-A-M.

25   Q.  Where do you work?

1   A.   I'm currently assigned as a special agent to the FBI's

2   Washington Field Office.

3   Q.   And how long have you worked there?

4   A.   Just over two years.

5   Q.   What are your duties there at the FBI?

6   A.   I work on a squad that's responsible for investigating

7   international terrorism matters.

8   Q.   And are you one of the primary case agents assigned to this

9   case?

10  A.   I am.

11  Q.   Do you see the defendant, Eric Harroun, in the courtroom?

12        MR. KAMENS:  Stipulate to identity, Your Honor.

13        THE COURT:  So stipulated.

14  BY MR. BURWELL:

15  Q.   Agent Higginbotham, did you prepare an affidavit in support

16  of this criminal complaint in this case?

17  A.   I did.

18        MR. BURWELL:  Your Honor, may I pass this up?

19        THE COURT:  You may.

20  BY MR. BURWELL:

21  Q.   Showing you what's been marked as Government Exhibit 1, do

22  you recognize that document?

23  A.   I do.

24  Q.   What is it?

25  A.   It's a criminal complaint filed against Eric Harroun.

1  Q.  Is that the criminal complaint in this case?

2  A.  It is.

3  Q.  Is that your signature on the last page of the document?

4  A.  It is.

5  Q.  Is the information contained in Government Exhibit 1 a true

6  and accurate reflection of the facts as known at the time of the

7  affidavit in support of probable cause that Eric Harroun

8  committed at least one crime?

9  A.  That's correct.

10  Q.  Was that crime conspiracy to use a weapon of mass

11  destruction outside of the United States?

12  A.  Yes.

13  Q.  And specifically, that was an RPG?

14  A.  Correct.

15  Q.  In the -- do you have any additions or corrections with

16  regard to the affidavit?

17  A.  No, sir.

18  Q.  For the purposes of today's hearing, do you incorporate and

19  adopt the facts as set forth in the affidavit?

20  A.  I do.

21          MR. BURWELL:  Thank you, Your Honor.  Just a moment.

22          Your Honor, I'll move to admit that into evidence.

23          MR. KAMENS:  No objection, Your Honor --

24          THE COURT:  So admitted.

25          MR. KAMENS:  -- for purposes of this hearing.

1          MR. BURWELL:  No further questions at this time.

2          THE COURT:  Mr. Kamens.

3                        **CROSS-EXAMINATION**

4   BY MR. KAMENS:

5   Q.  Mr. Higginbotham -- did I say that right?  Higginbotham?

6   A.  Correct.

7   Q.  You just said that your duties at the FBI involve

8   investigating acts of terrorism by U.S. nationals?

9   A.  Correct.

10  Q.  And there's no allegation in this case or in this affidavit

11  that Mr. Harroun has engaged in any acts of terrorism; is that

12  right?

13  A.  There's nothing presented in this complaint, no, sir.

14  Q.  And you're not aware of any information that Mr. Harroun has

15  participated in any act of terrorism against the United States;

16  is that correct?

17  A.  Correct.

18  Q.  The only allegation that you're aware of in this complaint

19  or elsewhere is that he fought combatants in Syria; is that

20  right?

21  A.  Correct.

22  Q.  In paragraph 4 of your affidavit, you describe an

23  organization or actually a rebel faction in Syria called Jabhat

24  al-Nusra; is that right?

25  A.  Correct.

P. Higginbotham - Cross                                              6

1   Q.  And they were designated as an alias of al-Qaeda in Iraq in

2   December of 2012 by the United States government; is that right?

3   A.  Correct.

4   Q.  And that organization has an extremely limited membership;

5   is that correct?

6   A.  I'm not aware of their membership qualifications.

7   Q.  Is it -- to the best of your knowledge, is it true that you

8   cannot join Jabhat al-Nusra unless you're a strictly observant

9   Muslim?

10  A.  I'm not aware of that fact.

11  Q.  You don't know anything about the membership requirements to

12  get into Jabhat al-Nusra?

13  A.  I don't.

14  Q.  In paragraph 7 you describe Mr. Harroun's foreign travel

15  according to his travel records; is that right?

16  A.  Correct.

17  Q.  All of those, to the best of your knowledge, all of the

18  travel that Mr. Harroun has engaged in was under his own name?

19  A.  Correct.

20  Q.  Using his own passport?

21  A.  Correct.

22  Q.  Never used an alias?

23  A.  Not to my knowledge.

24  Q.  And Mr. Harroun's passport has been seized; is that right?

25  A.  Correct.

1   Q.   Was it seized by the FBI?

2   A.   As part of his property, yes, it was.

3   Q.   All right.  So the FBI has custody of his passport; is that

4   right?

5   A.   Correct.

6   Q.   In paragraph 9 you note that Mr. Harroun traveled to Turkey

7   in November 2012 and he entered Syria on or about January 7,

8   2013, from Kilis?

9   A.   Correct.

10  Q.   That's Kilis, Turkey?

11  A.   Correct.

12  Q.   And that's in the northern part of Syria; is that right?

13  A.   Correct.

14  Q.   The northern border that is between Turkey and Syria?

15  A.   Correct.

16  Q.   And this information comes from Mr. Harroun?

17  A.   This information was actually provided to us by the Turkish

18  government as well through the U.S. State Department.

19  Q.   So Mr. Harroun volunteered that information and you've

20  confirmed it through the Turkish government; is that right?

21  A.   We had knowledge of that information before, and Mr. Harroun

22  confirmed it to us.

23  Q.   And that's because Mr. Harroun used his own name when he

24  entered Syria?

25  A.   Correct.

1    Q.   He used his own travel documents?

2    A.   Yes.

3    Q.   And when Mr. Harroun returned to Turkey from Syria, he

4    voluntarily approached government agents to provide information

5    about his experience?

6    A.   He did eventually, yes.

7    Q.   Eventually.  Within a few days?

8    A.   I'm not sure when he first approached U.S. government

9    entities.  I'm just aware of the fact of when he spoke to the

10   FBI at the consulate in Istanbul.

11   Q.   And when he approached the FBI at the consulate in Istanbul,

12   he wasn't asked to come for his initial meeting, was he?

13   A.   No.  No, he was not asked to come there.

14   Q.   All right.  And he stated that he went to Syria to join an

15   FSA unit or a Free Syrian Army unit; is that right?

16   A.   Correct.

17   Q.   To fight against Bashar al-Assad?

18   A.   Correct.

19   Q.   In paragraph 10 you describe a video in which Mr. Harroun --

20   actually, two videos -- in which Mr. Harroun appears; is that

21   right?

22   A.   Correct.

23   Q.   And Mr. Harroun purportedly says that Bashar al-Assad's days

24   are numbered; is that right?

25   A.   Yes.

1   Q.   Is that similar to what the United States government has

2   said about Bashar al-Assad?

3   A.   I'm not familiar with the extent of the statements by the

4   U.S. government towards Bashar al-Assad.

5   Q.   You are aware that the U.S. government does not believe that

6   Bashar al-Assad is the legitimate ruler of the Syrian people; is

7   that right?

8   A.   I'm aware that the U.S. government have made statements

9   supporting the Syrian people's right to have a democratic

10  government.

11  Q.   And you're aware that the rebels that are fighting against

12  the Syrian government are considered to have a legitimate right

13  to fight against the Assad regime?

14  A.   In their purview, correct.   That's a sovereign matter.

15  Q.   In paragraph 11 you describe a video of a downed helicopter?

16  A.   Correct.

17  Q.   And that Mr. Harroun is traveling in a Jeep; is that right?

18  A.   Yes, sir.

19  Q.   In the video?

20  A.   Yes, sir.

21  Q.   And the Jeep has an insignia on it, does it not?

22  A.   There's an emblem on the windshield, correct.

23  Q.   And the emblem is of the FSA; is that right?

24  A.   As Mr. Harroun stated, yes, it was.

25  Q.   Have you confirmed it?

1   A.   We haven't confirmed it.   That there's no one that said

2   directly this is an FSA vehicle, no.

3   Q.   Have you confirmed that the insignia that's shown in the

4   video is actually an FSA insignia?

5   A.   No, we haven't confirmed it.   No.

6   Q.   All right.   Well, you know that is not an insignia of Jabhat

7   al-Nusra?

8   A.   Correct.

9   Q.   In paragraph 12 you describe Facebook photos of Mr. Harroun

10  with an RPG and a machine gun?

11  A.   Yes, sir.

12  Q.   You have no independent evidence that those weapons are

13  actually functioning?

14  A.   Excuse me?

15  Q.   You have no independent evidence, sir, that those weapons

16  that are pictured in those photographs actually work?

17  A.   Correct.   They're just photos.   He's not firing them.

18  Q.   Are you familiar with other Americans who have posted videos

19  of themselves actually firing an RPG?

20  A.   I'm not.

21  Q.   You're not familiar with Matthew VanDyke?

22  A.   The name sounds familiar, but that's not a case that I've

23  worked on nor do I have extensive knowledge of that case.

24  Q.   In paragraph 13 of your affidavit you note that Mr. Harroun

25  on his Facebook account made comments about killing Shabiha; is

1   that right?

2   A.  Correct.

3   Q.  That's a Syrian government militia?

4   A.  Yes, sir.

5   Q.  Do you know whether they're designated as a terrorist

6   organization by the United States?

7   A.  I do not.

8   Q.  You have no information to corroborate the statements that

9   Mr. Harroun made on his Facebook account?

10  A.  Excuse me?

11  Q.  You have no information, sir, to corroborate the information

12  that Mr. Harroun states on his Facebook account?

13  A.  Those -- I mean, those are statements that he made and then

14  the statements that he made to us during his interviews.

15  Q.  My question, sir, is is that you have no information to

16  corroborate the statements that he made on his Facebook account

17  that you describe in paragraph 13?

18  A.  No.  Besides the statements themselves, no.

19  Q.  All right.  Paragraph 15 of your affidavit you note that on

20  March 12th Mr. Harroun went to the U.S. consulate in Turkey?

21  A.  Correct.

22  Q.  And he showed up on his own as you mentioned before.

23  A.  Correct.

24  Q.  Do you know how long the interview was?

25  A.  The first interview that Mr. Harroun participated in lasted

1   approximately two hours.

2   Q.   All right.   And Mr. Harroun was cooperative during the

3   interview?

4   A.   Yes, he was.

5   Q.   And you were not present during that interview?

6   A.   I was not.

7   Q.   And he was not taken -- Mr. Harroun was not taken into

8   custody at the conclusion of that interview?

9   A.   No, sir.

10  Q.   He was asked to come back on March 18th --

11  A.   Yes, sir.

12  Q.   -- of this year?   And Mr. Harroun came back voluntarily?

13  A.   Yes, sir.

14  Q.   He came back on time?

15  A.   I'm not sure if he came back exactly on time.   I think he

16  might have been a few minutes late, but he did come back on the

17  date that they asked him to.

18  Q.   Were you present at that interview?

19  A.   I was not.

20  Q.   Do you know how long that interview took place?

21  A.   I do not.

22  Q.   Mr. Harroun was not taken into custody on March 18th after

23  the second interview?

24  A.   No, sir.

25  Q.   Mr. Harroun was asked to come back a third time?

1   A.   Yes, sir.

2   Q.   On March 25th?

3   A.   Yeah.  Correct.

4   Q.   And Mr. Harroun came back?

5   A.   Yes, sir.

6   Q.   And he gave an interview?

7   A.   Yes, sir.

8   Q.   Do you know how long that occurred?

9   A.   I do not, sir.

10  Q.   He was not taken into custody at the conclusion of that

11  interview?

12  A.   No, sir.

13  Q.   In fact, Mr. Harroun was given a ticket, an airplane ticket,

14  to return to the United States?

15  A.   Correct.

16  Q.   On March 27th?

17  A.   Yes, sir.

18  Q.   And he accepted the ticket?

19  A.   Yes, sir.

20  Q.   Came back to the United States?

21  A.   Yes, sir.

22  Q.   Voluntarily?

23  A.   Yes, sir.

24  Q.   Not in custody?

25  A.   Not in custody.

1   Q.  In paragraph 16 you describe statements from this first

2   interview that Mr. Harroun gave in which he said that he went to

3   Syria to fight Bashar al-Assad, the regime?

4   A.  Correct.

5   Q.  He went to join the FSA?

6   A.  Correct.

7   Q.  And all of the information that you have confirms to date

8   that that is actually what he intended to do, to join the FSA to

9   fight Bashar al-Assad; is that right?

10  A.  Correct.

11  Q.  And the FSA is not a designated terrorist group?

12  A.  No, sir.

13  Q.  And you agree that certainly the FSA has the right to fight

14  against the illegitimate regime, Bashar al-Assad?

15          MR. BURWELL:  Objection, Your Honor.

16          THE COURT:  Basis?

17          MR. BURWELL:  It's causing the agent to speculate, Your

18  Honor.

19          THE COURT:  Objection overruled.

20          THE WITNESS:  Do I believe that they have a right to

21  fight against Bashar al-Assad?  It's a sovereign matter so they

22  certainly have a right to do what is in the purview of their

23  laws within their country.

24  BY MR. KAMENS:

25  Q.  All right.  And to the best of your knowledge, the rebel

1    groups within Syria are acting within the ordinary course of the

2    laws that allow them to fight against Bashar al-Assad, is that

3    right, to the best of your knowledge?

4    A.   I don't believe legally they have a right to take up arms

5    against their own government.   But I would be remiss.   I'm not

6    an expert on Syrian law so I would assume though that they don't

7    have the right to take up arms against their government.

8    Q.   And so you're saying that you believe that the regime, the

9    Syrian regime, has the right to criminalize the rebels, that

10   they're violating the law of Syria by taking up arms against the

11   regime?

12           MR. BURWELL:   Objection, Your Honor.   I don't think

13   this agent has a foundation in international law or Syrian law

14   to comment on that.

15           THE COURT:   Mr. Kamens.

16           MR. KAMENS:   Your Honor, that's an astounding

17   concession.   The law with which Mr. Harroun is alleged to have

18   violated is that he possessed a weapon of mass destruction, an

19   RPG, without lawful authority.   If the government is saying that

20   this agent has no ability to determine or to provide testimony

21   that he was without lawful authority, then the government is

22   conceding that they can't establish the charge.

23           THE COURT:   Government counsel.

24           MR. BURWELL:   Your Honor, we're not conceding that

25   there's absolutely no evidence that this defendant had lawful

1    authority from the United States government or any other

2    government.  Agent Higginbotham is not an expert in what is a

3    crime in Syria.  And I think Mr. Kamens should lay a proper

4    foundation for that if he seeks to explore this with Agent

5    Higginbotham.

6              THE COURT:  Well, if he asked the witness the question,

7    the question -- the answer to the question is I don't know.

8    Whether he's an expert or not is irrelevant.

9              MR. BURWELL:  Yes, Your Honor.

10             THE COURT:  He either knows or he doesn't know.

11   Correct?

12             MR. BURWELL:  Correct.

13             THE COURT:  Objection overruled.

14   BY MR. KAMENS:

15   Q.  Sir, so you have no knowledge or ability to testify about

16   the law in Syria.  As you testified, this is a sovereign matter

17   in Syria; is that right?

18   A.  Correct.

19   Q.  Paragraph 17 you relate that Mr. Harroun said in his first

20   interview that he encountered the al-Nusra Front in a battle; is

21   that right?

22   A.  Prior to the battle is when he first made contact with the

23   al-Nusra Front.

24   Q.  Well, that he was not a part of any al-Nusra Front group,

25   but that he jumped in a truck as he was retreating from a battle

1  and it was driven by someone who's a member of al-Nusra Front;

2  is that right?

3  A.   Correct.

4  Q.   And they took him back to a camp?

5  A.   Correct.

6  Q.   And Mr. Harroun asked to be returned to his FSA unit; is

7  that right?

8  A.   Correct.

9  Q.   In Azaz?

10  A.   Correct.

11  Q.   In paragraph 18 you note that Mr. Harroun says that he was

12  initially treated like a prisoner?

13  A.   Yes, sir.

14  Q.   His weapons were taken away?

15  A.   Yes, sir.

16  Q.   He was guarded.

17  A.   Yes, sir.

18  Q.   Wasn't free to leave?

19  A.   Correct.

20  Q.   Said he wanted to return to his unit in Azaz?

21  A.   Correct.

22  Q.   And he kept being told they would take him back tomorrow?

23  A.   Correct.

24  Q.   After some period of time, Mr. Harroun's weapons were

25  returned to him; is that right?

1   A.   Yes, sir.

2   Q.   And he then participated in a fire fight?

3   A.   Correct.

4   Q.   And was accepted?

5   A.   Correct.

6   Q.   That is, he was no longer imprisoned?

7   A.   He was not -- they did not provide close supervision to him

8   as they did in the past prior to the battle, correct.

9   Q.   All right.  But they still didn't take him back to his unit

10  in Azaz?

11  A.   That's correct.

12  Q.   Even though he wanted to?

13  A.   Yes, sir.

14  Q.   Mr. Harroun told U.S. authorities that he was afraid if he

15  didn't participate that he would be considered an American spy

16  and killed?

17  A.   Those statements were not made to me, no, sir.

18  Q.   Are you aware that Mr. Harroun made those statements to

19  officials of the U.S. government?

20  A.   No, sir.

21  Q.   Do you have any independent confirmation of the information

22  that Mr. Harroun provided about his experience with this

23  al-Nusra Front unit?

24  A.   The statements that Mr. Harroun made are certainly what

25  we're going off of and then also his Facebook postings, social

1    media, and there's also various news articles that were printed

2    that relate to this matter as well.

3    Q.   News articles containing statements from Mr. Harroun?

4    A.   Correct.

5    Q.   So you're going off of, as you say, the statements from

6    Mr. Harroun, his Facebook posts, and newspaper articles; is that

7    right?

8    A.   Correct.

9    Q.   And you have not identified any of the individuals in these

10   videos that purport to show al-Nusra Front members as actually

11   members of the al-Nusra Front?

12   A.   The investigation is ongoing so we're still investigating

13   those matters.

14   Q.   As of today, sir, and you're under oath, if you can say

15   whether any of those individuals in those videos that purport to

16   be members of the al-Nusra Front have been actually identified

17   as members of this group?

18   A.   No, they haven't.

19   Q.   In paragraph 19 you say that Mr. Harroun said he shot up to

20   ten people?

21   A.   Correct.

22   Q.   And you have no information to corroborate this statement?

23   A.   No, sir.

24   Q.   You have no independent information confirming that

25   Mr. Harroun ever killed anyone?

1  A.  No, sir.

2  Q.  No, sir, that's correct?

3  A.  It's correct.

4  Q.  Paragraph 22 you note that in Mr. Harroun's first interview,

5  Mr. Harroun said that he hated al-Qaeda; is that right?

6  A.  Correct.

7  Q.  And he's never said anything to suggest that he had adopted

8  a fundamentalist or jihadist viewpoint; is that right?

9  A.  No, sir.  That's correct.

10  Q.  In paragraph 23, you describe that Mr. Harroun said in his

11  second interview that he engaged in seven to ten battles with

12  the group calling themselves members of the al-Nusra Front?

13  A.  Correct.

14  Q.  And that he took a video?

15  A.  Correct.

16  Q.  And as you mentioned before, you have no information that

17  independently corroborates that the individuals in the video are

18  actually members of the al-Nusra Front?

19  A.  Correct.

20  Q.  In paragraph 24 you say that Mr. Harroun said in his third

21  interview that he received training on how to operate an RPG?

22  A.  Yes, sir.

23  Q.  Do you know how long the training took place?

24  A.  I do not.

25  Q.  Could have been for five minutes or less?

1    A.   It's possible.

2    Q.   Do you know where it occurred?

3    A.   I do not.

4    Q.   Do you know whether the instructions were correct?

5    A.   I do not.

6    Q.   Mr. Harroun said that he fired an RPG at least one time?

7    A.   Correct.

8    Q.   The only source of that information is Mr. Harroun?

9    A.   Correct.

10   Q.   You have no information independently corroborating this --

11   the statement from Mr. Harroun?

12   A.   No, sir.

13   Q.   No, sir, that's correct?

14   A.   No, sir, that's correct.

15   Q.   Paragraph 25 you say that Mr. Harroun returned to the United

16   States on March 27th and that's the trip that he took at the

17   behest of the U.S. government, they provided him a ticket?

18   A.   Correct.

19   Q.   And as you mentioned he was not in custody?

20   A.   No, he was not in custody.

21   Q.   And he agreed to return voluntarily?

22   A.   Yes, sir.

23   Q.   And he agreed actually to a fourth interview with U.S.

24   officials?

25   A.   He did, yes.

1   Q.   Mr. Harroun said that while he was fighting with the

2   al-Nusra Front he learned that the al-Nusra Front was a

3   designated terrorist organization in this fourth interview; is

4   that right?

5   A.   He did not specifically say when he learned that they were a

6   designated terrorist group.

7   Q.   Could have been after all of the fighting took place?

8   A.   No.  He specifically made comments in conversations that he

9   had with al-Nusra fighters.  They asked him why the United

10  States had designated them a terrorist organization to which he

11  replied he was unsure why the U.S. had designated them a

12  terrorist organization.

13  Q.   Do you know -- I'm sorry.  Do you know what language they

14  were communicating in?

15  A.   I do not.

16  Q.   And you don't have any information to suggest that

17  Mr. Harroun's fluent in Arabic?

18  A.   I do not.

19  Q.   And do you have any independent information that these

20  individuals communicating with Mr. Harroun actually said or

21  asked the question why has the United States designated our

22  group as a terrorist organization?

23  A.   No, sir.

24  Q.   You have no idea what words were actually used in those

25  conversations with Mr. Harroun?

1   A.   Just what Mr. Harroun has told us.

2   Q.   And those individuals could have easily said in broken

3   English why is the U.S. calling us terrorists?

4   A.   I'm sure we could speculate that they might have asked that

5   question.

6   Q.   And speculate because we have no independent information to

7   corroborate the statements from Mr. Harroun; is that right?

8   A.   Correct.

9   Q.   In paragraph 26 you say that Mr. Harroun said he was part of

10  an RPG team during one fire fight?

11  A.   Correct.

12  Q.   Again, the information that he's provided isn't

13  independently corroborated?

14  A.   It's based off of his statements, yes, sir.

15  Q.   And that's the -- true of the vast majority of the

16  information in this affidavit?

17  A.   Yes, sir.

18  Q.   There's no independent evidence to corroborate what he said?

19  A.   It's based primarily off of his statements just as you

20  indicated.

21  Q.   And you have no information to corroborate that Mr. Harroun

22  actually used an RPG while in Syria?

23  A.   No, sir.  Just his statements.

24         MR. KAMENS:  Thank you, sir.

25         THE COURT:  Any redirect?

1          MR. BURWELL:  Thank you, Your Honor.

2                    **REDIRECT EXAMINATION**

3    BY MR. BURWELL:

4    Q.  Agent Higginbotham, when you arrested -- when Mr. Harroun

5    was arrested at the airport -- sorry -- at Dulles, did you

6    recover any additional evidence from him?

7    A.  We did.  We took possession of his belongings, including all

8    of his luggage.

9    Q.  Did some of that include digital evidence or digital media?

10   A.  Yes, sir.

11   Q.  Can you describe some of that?

12         MR. KAMENS:  Outside the scope, Your Honor.

13         MR. BURWELL:  Your Honor --

14         THE COURT:  You specifically asked whether or not they

15   had any information to corroborate Mr. Harroun's statements.

16   That's definitely within the scope.  Objection overruled.

17         MR. KAMENS:  Understood.

18   BY MR. BURWELL:

19   Q.  You were going to explain some of that evidence.

20   A.  Yes, sir.  We recovered an iPhone device, an iPad, a laptop,

21   digital camera.  There were approximately three small memory

22   cards that we also recovered and one SIM card.

23   Q.  I'd like to -- did you recover in that collection any

24   videos, new videos that weren't put out by Mr. Harroun on the

25   Internet?

1   A.   We did, yes, sir.

2   Q.   Did some of those -- did at least one of those videos show

3   Mr. Harroun to be engaged in combat with rebels in Syria?

4   A.   Yes, sir.

5   Q.   Did any of those videos show Mr. Harroun celebrating the

6   death of opposing forces there in Syria?

7   A.   There was two particular videos in which there was a

8   positive atmosphere on (inaudible) that were depicted in the

9   video, yes, sir.

10  Q.   Did any of those videos show an individual appearing to be

11  Mr. Harroun in some type of press conference with what appears

12  to be an Islamic group there?

13  A.   There is one video which shows the template of basically of

14  an armed group.  There's several men holding the rifles in the

15  air.  There's a gentleman seated at a table with a laptop and a

16  grenade and an automatic rifle in front of him.  He seems to be

17  reading a statement from the computer and the group chants

18  throughout the video.

19       There's one particular person in the video that it pans in

20  on that we would think is Mr. Harroun based on the -- the

21  close-up focus of that person.

22            MR. BURWELL:   Your Honor, if I may show the agent

23  Government Exhibit -- what's been marked as Government

24  Exhibit 2.

25  BY MR. BURWELL:

1   Q.   Is this a screenshot from that video?

2   A.   Yes, sir.

3   Q.   In reviewing Mr. Harroun's Facebook material, did he ever

4   make any claim or assertion that he may have been involved in

5   the death of another individual?

6   A.   Yes, sir.

7   Q.   Showing you what's been marked as Government Exhibit 3, what

8   is that?

9   A.   It appears to be a ballistic helmet, the inside showing what

10  appears to be blood on the inside of the helmet.

11  Q.   Did you obtain that from his Facebook post?

12  A.   Yes, sir.  It was obtained from the search warrant that we

13  executed on his Facebook, correct.

14  Q.   You -- Mr. Kamens asked you a little bit about Mr. Harroun's

15  travel.  Based on your investigation, Mr. Harroun traveled

16  throughout the Middle East --

17  A.   Yes, sir.

18  Q.   -- previously?

19  A.   Yes, sir.

20  Q.   Mr. Kamens asked you about Mr. Harroun's travel always under

21  his passport; is that correct?

22  A.   Correct.

23  Q.   Are you aware that Mr. Harroun may have snuck into Palestine

24  through Egypt?

25  A.   Yes, sir.

1              MR. KAMENS:  I object to this as leading, outside the

2    scope, and irrelevant.

3              THE COURT:  Objection sustained.

4              MR. BURWELL:  On the basis of leading, Your Honor?

5              THE COURT:  It's leading, and I don't think we've heard

6    anything about Palestine during direct examination or

7    cross-examination and I don't know what Palestine would be

8    corroborating.  So on that basis it's also outside the scope.

9    BY MR. BURWELL:

10   Q.  Are you aware that Mr. Harroun traveled internationally

11   without using a passport?

12   A.  He did go into another country without his passport at

13   times, yes, sir.

14   Q.  And was that travel according to Mr. Harroun with the

15   assistance of a designated terrorist organization?

16   A.  Yes, sir.

17   Q.  Has he previously shown an affiliation to other terrorist,

18   designated foreign terrorist organizations?

19   A.  There several years ago that a neighbor had phoned the FBI

20   with a complaint that there was a Hezbollah flag being flown

21   from Mr. Harroun's balcony in Phoenix.

22   Q.  And just to be clear, Hezbollah is another foreign terrorist

23   organization?

24   A.  Yes, sir.

25   Q.  So when Mr. Kamens has asked you whether there was other

 1  information other than what Mr. Harroun has told you indicating

 2  his involvement in terrorist activity, the videos from his

 3  cellphone and iPhone corroborate that information; is that

 4  correct?

 5  A.   Correct.

 6        MR. BURWELL:  No further questions, Your Honor.

 7                    **RECROSS EXAMINATION**

 8  BY MR. KAMENS:

 9  Q.  Mr. Higginbotham, you mentioned a press conference --

10        THE COURT:  Mr. Kamens.

11        MR. KAMENS:  I'm sorry.

12        THE COURT:  The Court has not given you leave to take

13  additional questions of this witness.

14        MR. KAMENS:  My apologies.

15        THE COURT:  Since the government has the burden, they

16  usually get the last word.

17        MR. KAMENS:  My apologies, Your Honor.  May I ask some

18  follow-up questions based solely on the additional questions

19  that the government has asked?

20        THE COURT:  Does the government have any objections?

21        MR. BURWELL:  No, Your Honor.

22        THE COURT:  You may proceed.

23        MR. KAMENS:  Thank you, Your Honor.

24  BY MR. KAMENS:

25  Q.  Mr. Higginbotham, you mentioned a press conference that

1    Mr. Harroun apparently participated in in the picture in

2    Government Exhibit 2?

3    A.   Correct.

4    Q.   And you don't know what group or what faction of Syrian

5    rebels that group is affiliated with?

6    A.   No, sir.

7    Q.   There are no black flags or black patches to suggest that

8    they're members of the al-Nusra Front?

9    A.   No, sir.

10   Q.   And Mr. Harroun makes no statements during this video?

11   A.   No, sir.

12   Q.   And you have no information to suggest that the video is

13   anything but propaganda against the Bashar al-Assad regime?

14   A.   Because the contents are in Arabic, we haven't had time to

15   analyze what is being said so we're not exactly sure what the

16   video is.  Just basically the screenshot shows several armed men

17   chanting in favor of the statements that the gentleman is making

18   at the desk.

19   Q.   And you don't know what those are?

20   A.   No, sir.

21   Q.   Exhibit 3 that you were shown, a picture of a helmet that

22   appears to be bloody from a Facebook post --

23   A.   Correct.

24   Q.   -- you have nothing to corroborate that Mr. Harroun had

25   anything to do with any violence associated with that helmet?

1  A.  There's a video in which the helmet appears to be worn by an

2  individual who is deceased.  Based on my assessment, it appears

3  that the picture of this helmet is the same that's being worn by

4  the individual in that video.

5  Q.  Sir, listen to my question.  And that is that you have no

6  independent corroboration that Mr. Harroun had anything to do

7  with the violence associated with that helmet?

8  A.  No, sir, just his statements.

9  Q.  It could have been boasting on the Internet?

10 A.  Could have been.

11 Q.  The last thing you spoke about was Mr. Harroun's travel in

12 the Middle East.

13 A.  Yes, sir.

14 Q.  And that Mr. Harroun flew a flag representing Hezbollah when

15 he was in Phoenix several years ago.

16 A.  Correct.

17 Q.  When?

18 A.  I'm not sure of the specific date.

19 Q.  Was there anything unlawful about flying a Hezbollah flag?

20 A.  No, sir.

21 Q.  In the United States?

22 A.  No, sir.

23 Q.  Do you know if it was taken down?

24 A.  I do not know, sir.

25 Q.  Do you know how long it was flown?

1  A.  I do not, sir.

2  Q.  Do you know if there were any criminal charges associated

3  with it?

4  A.  I don't believe so, sir.

5  Q.  Do you know if Mr. Harroun engaged in any additional contact

6  with Hezbollah in the last three years?

7  A.  I know that he commented on a trip to Lebanon that he had

8  some contact with some Hezbollah members.  He had provided

9  those -- that information to us.

10  Q.  What kind of contact?

11  A.  Basically, he had spoken to some individuals that claim to

12  be part of Hezbollah.  They questioned him against his will and

13  for approximately two hours is what he told us.

14  Q.  All right.  So to the best of your knowledge, the past three

15  years the only contact that he's had was questioning that was

16  against his will when he traveled to Lebanon?

17  A.  Those are statements that he provided to us.

18  Q.  And you have no independent information to suggest that

19  Mr. Harroun has ever done anything, to send money to Hezbollah

20  or enlist to fight on behalf of Hezbollah?

21  A.  No, sir.

22  Q.  No, sir, that's correct?

23  A.  No, sir, that's correct.  We don't have information to that

24  effect.

25          MR. KAMENS:  Thank you.

 1          THE COURT:  The government have any further redirect

 2  based upon questions of counsel?

 3          MR. BURWELL:  No, Your Honor.

 4          THE COURT:  Okay.  Agent Higginbotham, you may step

 5  down.  (Witness stands down.)

 6          Does the government have anything further in regards to

 7  probable cause?

 8          MR. BURWELL:  No, Your Honor.

 9          THE COURT:  Any arguments as to probable cause?

10          MR. BURWELL:  No, Your Honor.  We believe that the

11  complaint states probable cause for the crimes charged in the

12  affidavit.

13          MR. KAMENS:  Your Honor, the offense listed in the

14  affidavit and the complaint is 18 U.S.C. 2332a subsection (b),

15  that proscribes any national of the United States who, without

16  lawful authority, uses or threatens, attempts, or conspires to

17  use, a weapon of mass destruction.  That includes a destructive

18  device which includes in its definition a grenade or rocket with

19  four grams of explosive material.

20          The statute is carefully drawn, I would suggest, to

21  exclude certain individuals from its scope, certainly

22  individuals who are fighting on behalf of the United States

23  military, but that would be encompassed in an affirmative

24  defense that already exists, public authority.

25          It also is designed to exclude anyone else with lawful

1  authority from possessing something, such as an RPG, who has the

2  lawful authority of the group that issues that weapon, such as

3  an individual who -- from America who goes to do a two-year

4  stint with the Israeli Defense Forces or an individual who goes

5  to fight with the French Foreign Legion.

6          There are a number of organizations around the world,

7  Your Honor, that have lawful authority.  And the question for

8  the Court is whether there's probable cause that in this case

9  when an individual is given a weapon from a group fighting

10  against a regime that the government itself calls illegitimate

11  when the witness on the stand says he has no real information

12  about the law in Syria, it's a sovereign matter, whether that

13  constitutes probable cause from the government's burden that --

14  to show that Mr. Harroun did not have lawful authority.

15          I would suggest that they have not met that burden.

16  One, because the witness himself disclaimed any knowledge; and,

17  secondly, because we're all aware and the Court can take

18  judicial notice of the fact that the United States has said that

19  the Syrian regime must go, has certainly provided nonlethal

20  support for the rebels.  And the government's not in the

21  position to say that those rebels fighting against this

22  illegitimate regime do not have lawful authority to use

23  conventional weapons.  We're not talking about an allegation

24  that Mr. Harroun used chemical or biological weapons or

25  certainly nuclear weapons.  We're talking about run-of-the-mill,

1    conventional weapon used in fire fights all across the world.

2         And in this circumstance, Your Honor, it is very

3    difficult for the government to say that the rebels in Syria do

4    not have lawful authority either under international law or

5    their own domestic law to fight against this illegitimate

6    regime.  And for that reason, Your Honor, we would suggest

7    there's no probable cause in this case.

8         THE COURT:  The Court not having in its possession any

9    legal authority that says or suggests that the view of the

10   United States concerning a foreign government provides a United

11   States citizen legal authority to fight against that regime, the

12   Court does not believe that that would prevent this Court from

13   concluding that probable cause exists for the charged offense.

14        What does provide some probable cause, obviously, is

15   the fact that not only was Mr. Harroun allegedly fighting with

16   the Free Syrian Army, based on his own statements he was

17   fighting with the Free Syrian Army with an organization that has

18   been -- that the United States has determined and has cited as a

19   terrorist organization.

20        The Court does not believe that it will be reasonable

21   to infer or reasonable to include that a United States citizen

22   who was fighting alongside a terrorist organization or with the

23   belief that he's fighting alongside a terrorist organization

24   would have lawful authority to do so.  It's probably the United

25   States conclusion that a United States citizen that fights along

 1    any or with any terrorist organization is doing something

 2    unlawful because aiding and abetting a terrorist organization

 3    would be unlawful.

 4         Therefore, the Court finds that the government has

 5    satisfied its burden to prove probable cause exists for the

 6    allegation as set forth in the charge in the complaint.  The

 7    matter will be referred to grand jury for further proceedings.

 8         MR. KAMENS:  Your Honor, with respect to detention, may

 9    we approach the bench briefly?

10         THE COURT:  You may.

11       (Conference at the bench, as follows:)

12         MR. KAMENS:  I provided this letter to the government

13    previously and to the pretrial services office.  I wanted to

14    provide it to you as well.  It's a letter from a veterans'

15    benefits coordinator who discusses the mental health treatment

16    options that will be available to Mr. Harroun.

17         I asked to come to the bench simply because I would

18    prefer that all medical information or mental health issues not

19    be disclosed in open court to protect Mr. Harroun's privacy.

20         But I would ask that -- then I will say, so I don't

21    have to come back, that for purposes of detention it's clear

22    that Mr. Harroun has a history of mental health -- mental health

23    history.

24    

25



            MR. KAMENS:  We certainly appreciate the government's
concern.  I would imagine it would be the Court's concern as
well.

            One of the things that Ms. Carrington, who's the
veterans' (inaudible) specialist, says in this letter is that
the VA would -- Mr. Harroun signed a release of information
giving Ms. Carrington permission to keep the Court informed of
his attendance and participation in any VA programs.

            So to the extent that mental health counselling or
mental health treatment or any kind of mental health options
were provided to Mr. Harroun, the Court would certainly have the
ability to keep tabs on whether he's abiding by his treatment.

            THE COURT:  Anything further?

            MR. BURWELL:  No, Your Honor.

            MR. KAMENS:  Thank you.

1      (Thereupon, the following proceedings continued in open

2 court:)

3           THE COURT:  In regards to detention, have both counsel

4 received both the original pretrial services report as well as

5 the addendum to said report?

6           MR. BURWELL:  Yes, Your Honor.

7           THE COURT:  Does either counsel dispute the accuracy of

8 the information contained in either report?

9           MR. KAMENS:  Court's indulgence, Your Honor.

10           MR. BURWELL:  Your Honor, I'm sorry.  I wasn't -- I

11 hadn't received the addendum.  If I might briefly read it.

12           Thank you, Your Honor.  I've had an opportunity to

13 review it.

14           THE COURT:  All right.  Do you dispute the accuracy of

15 the information contained in that report?

16           MR. BURWELL:  Your Honor, the information that -- the

17 accuracy, no.  The completeness of it, the government may have

18 some concerns about the completeness of it.

19           THE COURT:  What would not be complete?

20           MR. BURWELL:  We understand there is a history of a

21 difficult relationship between the defendant and his proposed

22 third-party custodian in that -- in that report, and that report

23 may not fully contain all of the details of that relationship.

24           THE COURT:  Would this be the only person who would

25 have had difficulty with their mother?

1          MR. BURWELL:  No, Your Honor, but I think difficulty

2    rising to the level of legal significance.  We understand that

3    the defendant has had domestic violence-type issues with both

4    parents and that that may not be reflected there.

5          THE COURT:  It appears the pretrial services conducted

6    a criminal background check, and the Court does not find any

7    charges for such except for the possibility of the disorderly

8    conduct fighting charge from Chandler, Arizona, in June of 2005

9    in which the pretrial services office was enable to locate

10   disposition for.

11         MR. BURWELL:  Your Honor, I'm --

12         THE COURT:  Was it your representation to the Court

13   that this occurred but did not rise to the level of being -- or

14   Mr. Harroun being arrested for?

15         MR. BURWELL:  Your Honor, if I may briefly speak to the

16   agent.

17         THE COURT:  You may.

18         MR. BURWELL:  Your Honor, it's my information that both

19   parents at a point in the past had restraining orders against

20   the defendant, and that the defendant referenced that

21   restraining order with his mother in a recent Skype

22   communication from Turkey.

23         THE COURT:  And when was -- is that restraining order

24   still in place to the best of your knowledge?

25         MR. BURWELL:  No, Your Honor.  That the re -- that

1  defendant had sought to -- had inquired about the ability to

2  return home with his mother and that she had -- she had thought

3  that would be a bad idea and the defendant referenced the fact

4  that she had previously had a restraining order for the

5  defendant, and therefore it wouldn't be wise for her to -- for

6  him to live with her -- reside with her again.

7          THE COURT:  Well, there is a reference in the original

8  pretrial services report that the mother thought it might be not

9  the best of ideas for her son to reside with her, but that

10  appears to have been based on her concern for her four-year-old

11  granddaughter because of the media attention to this case.

12         The Court doesn't see anywhere in the original pretrial

13  services report or the addendum to the pretrial services report

14  that the mother has professed to anyone that she thought it was

15  a bad idea or thinks it's a bad idea for her son to reside with

16  her based on past possible domestic issues.

17         MR. BURWELL:  Your Honor, that's the information that

18  we have.  I think as a larger issue the government's position is

19  that pretrial detention is necessary in this case as both -- to

20  protect the community and to prevent this defendant from

21  fleeing.  I'd be happy to address each of those issues.  This is

22  obviously a case that the Bail Reform Act creates a presumption

23  in favor of detention.

24         THE COURT:  And where is that?  Because the Court tried

25  to take a look at that itself.  And the Court's review it looked

1    like 18 U.S.C. 2332b was a presumption case.  This appears to be

2    2332a subparagraph (b).  The Court could have missed it.

3         MR. BURWELL:  Your Honor, I think -- so to start with

4    the Bail Reform Act, I think 18 U.S.C. 3142(e), and I'll start

5    there.  It directs the Court to 2332b(g)(5)(B).

6         THE COURT:  You say (g)?

7         MR. BURWELL:  2332b(g)(5)(B), which lists the -- what

8    are collectively called federal crimes of terrorism.  And 2332a

9    relating to the use of weapons of mass destruction is listed

10   there in 2332b(g)(5)(B).

11        THE COURT:  Mr. Kamens, would you concur then that this

12   is a presumption case?

13        MR. KAMENS:  We do, Your Honor.

14        MR. BURWELL:  Your Honor, the government is prepared

15   with argument about each of the factors identified in the bail

16   reform act.  And I can go into those --

17        THE COURT:  You have to be a little more than prepared.

18   You must give your argument if you want this defendant to be

19   detained.

20        MR. BURWELL:  Thank you, Your Honor.  So it is a

21   presumption case in light of the fact that it is a federal crime

22   of terrorism.  The first factor is the nature and circumstances

23   of the offense itself.  This is a very, very serious offense.

24   It is a federal crime of terrorism.

25             It carries a recommended sentence of at least

1   360 months to life in prison under the sentencing guidelines.

2   It involves the active participation and affiliation with a

3   designated foreign terrorist group that itself is affiliated

4   with al-Qaeda.  This defendant knowingly, willfully aligned

5   himself, participated with, according to his own statements,

6   Jabhat al-Nusra or al-Qaeda in Iraq, and he did so for

7   approximately 30 days.

8        Not only did he affiliate himself with a designated

9   foreign terrorist organization, he actively used what are

10  defined as weapons of mass destruction in support of them:

11  rocket-propelled grenades, grenades, sniper rifles, machine

12  guns.  And according to his own statements, and as Your Honor

13  has already said -- seen, postings on Facebook and videos, he

14  was actively engaged in military conflict.  Stated that he shot

15  roughly ten people, fired RPGs, participated in attacks, and

16  this was all within the last three months.

17       THE COURT:  Do you have any information that suggests

18  that he affiliated himself with these organizations or

19  participated actively with these organizations in the United

20  States?

21       MR. BURWELL:  No, Your Honor.

22       THE COURT:  Because obviously that's the community this

23  Court is most concerned with.

24       MR. BURWELL:  Yes, Your Honor.  We, at this time, apart

25  from information about his potential affiliation with Hezbollah

1  in 2008, the government is not aware of any information that the

2  defendant was actively affiliated with al-Qaeda in the United

3  States.

4       We know that he has been out of the country for five or

5  six months.  While out of the country, he knowingly affiliated

6  himself with a group linked to al-Qaeda.

7       THE COURT:  What the Court is trying to get to is why

8  would he present a danger to this community?

9       MR. BURWELL:  Because the evidence at this time shows

10  that within the last three months, this defendant knowingly

11  affiliated himself with a group linked to al-Qaeda.

12       THE COURT:  And Syria?

13       MR. BURWELL:  Correct, Your Honor.

14       THE COURT:  Syria is not the United States.  So the

15  Court's concern, once again, is whether or not there are a

16  combination of conditions of release that will reasonably assure

17  the safety of this community.

18       MR. BURWELL:  Yes, Your Honor.  At this time the

19  government's information that within the last three months he

20  knowingly affiliated himself with al-Qaeda, an al-Qaeda group in

21  Syria.  That this group requested that he perform the role of

22  Adam Gadahn, who is an American-born spokesperson for al-Qaeda.

23  That this group requested that he perform that role and that he

24  declined to do so.

25       But we have no information other than his direct

1    affiliation, known affiliation with a group of terrorists linked

2    to al-Qaeda as recently as February 2013.

3          THE COURT:  Then why wouldn't the conditions set forth

4    in the recommendations section of the addendum to the pretrial

5    services report address any concerns this Court may have

6    concerning him presenting a danger to this community?

7          MR. BURWELL:  Because as recently as three months

8    ago --

9          THE COURT:  The Court understands what he did in Syria.

10         MR. BURWELL:  And he was --

11         THE COURT:  You have no information that suggests that

12   he actively participated with or affiliated himself with a

13   terrorist organization in this community.  You have no

14   information that suggests that he intends to affiliate himself

15   or actively participate with a terrorist organization in this

16   community.

17         The Court's concerned about the danger to this

18   community.  The Court's less concerned about the danger to the

19   community in Syria.

20         MR. BURWELL:  Yes, Your Honor.  So we have now a U.S.

21   citizen who is here in the United States who has recently

22   affiliated himself with a terrorist organization who is now in

23   the United States, and while affiliated with that terrorist

24   organization, he engaged in military conduct.

25         THE COURT:  Against any United States citizen?

1        MR. BURWELL:  No, Your Honor, not that I'm aware of.

2        THE COURT:  In the United States?

3        MR. BURWELL:  No, Your Honor.  He engaged in military

4    conduct --

5        THE COURT:  The Court completely understands that.

6        MR. BURWELL:  Including attacking other human beings

7    with weapons of mass destruction.  That he is a trained U.S.

8    soldier who has in the last three months engaged in attacks on

9    other human beings while affiliated with a terrorist group.

10       THE COURT:  The Court understands your position.

11       MR. BURWELL:  Okay.  All within the last few months.

12       The weight of the evidence is another factor that this

13   Court is directed to take into account.  It is a very strong

14   case against this defendant.  It is based on his own admissions

15   to the conduct that I just highlighted, four separate

16   interviews, postings that he himself made on the Internet and

17   social networking sites, videos and photographs recovered from

18   the defendant's own electronic media.

19       This information has yet to be analyzed.  I understand

20   it's roughly one -- it's a significant amount of information,

21   computers, iPhones, videos.  It is extensive and the FBI is

22   currently viewing that.  We just uncovered recently a video of

23   the defendant engaged in some type of press conference with what

24   appears to be the designated terrorist group.  That's on the

25   evidence that we're continuing to review.

1          THE COURT:  Do you have any information that suggests

2   that this defendant has intended to incite others to conduct

3   themselves in the way he conducted himself in Syria?

4          MR. BURWELL:  Yes, Your Honor.

5          THE COURT:  What is that?

6          MR. BURWELL:  That the defendant was in communication

7   with others in an effort to assist them in traveling overseas.

8          THE COURT:  Here in the United States?

9          MR. BURWELL:  Your Honor, other individuals.  I need to

10  check with the agents briefly about whether those individuals --

11  whether we were able to determine whether those individuals were

12  Americans.  But I know for a fact that the defendant was

13  assisting and in communication with individuals about

14  facilitating their travel overseas --

15         THE COURT:  All right.

16         MR. BURWELL:  -- in order to engage in similar crimes.

17         THE COURT:  Well, you might want to check with your

18  agent.

19         MR. BURWELL:  Your Honor, that number, I'm advised, is

20  approximately 300 individuals, including U.S. citizens.

21         THE COURT:  All right.  You may proceed.

22         MR. BURWELL:  I was outlining some of the strength of

23  the government's case that would likely subject this defendant

24  to 360 months to life in prison.  As Your Honor is aware, the

25  charges involved are not -- other charges could subject the

1    defendant to a mandatory sentence of life.  And if as the

2    defendant has claimed in his postings and if as evidenced by the

3    material that is in the defendant's own phone, there is a

4    potential exposure to the death penalty in light of the fact

5    that death may have resulted by the defendant's conduct.

6              THE COURT:  So is it your representation to this Court

7    that if the government through its review of information in its

8    possession now or that will come -- or they will come in

9    possession of information that could possibly support a death

10   penalty charge, that the government intends to charge

11   Mr. Harroun in such a way?

12             MR. BURWELL:  No, Your Honor.  I don't mean to

13   represent that.  What I mean to represent is the severity of the

14   case.  The charge itself, 2332a, is a death-eligible offense.

15   And the government has evidence that -- this was a warzone --

16   that the defendant voluntarily joined.

17             THE COURT:  And how are you going to address what is

18   going to be Mr. Kamens' argument that he was fighting against a

19   regime even the United States opposes?

20             MR. BURWELL:  The -- he was fighting with a group that

21   was designated by the United States as a terrorist organization,

22   because it has engaged in hundreds of terrorist attacks,

23   including --

24             THE COURT:  So if he was not fighting with that group

25   and only fighting with the Free Syrian Army, would he be sitting

1   here today?

2          MR. BURWELL:   He would have committed a crime, yes,

3   Your Honor.

4          THE COURT:   That's not the Court's question.   The

5   Court's question is would he be sitting here today, meaning

6   would the government have charged him, if he had not actively

7   participated with an organization being the terrorist

8   organization by the U.S. if he was only fighting with the Free

9   Syrian Army against the Syrian regime?

10         MR. BURWELL:   Your Honor, before the Assistant United

11  States Attorney -- I don't know whether the Acting Assistant

12  Attorney General in charge of national security for the United

13  States -- at the Department of Justice would authorize that

14  charge.

15         I am unable to represent to you whether or not the

16  Acting Assistant Attorney General for national security would

17  authorize the charge.   I do know that the Acting Assistant

18  Attorney General for the United States, Department of Justice,

19  in charge of national security authorized the charge in this

20  case.

21         THE COURT:   Do you have any information that would

22  suggest that the United States Attorney for the Eastern District

23  of Virginia would have sought authorization for that charge?

24         MR. BURWELL:   Without discussing the matter directly

25  with the -- with the U.S. Attorney, I would be reticent to

1    represent what the U.S. Attorney would do.

2          I will, in an effort to answer your question more

3    directly, Your Honor, I will certainly state that the fact that

4    this U.S. citizen knowingly and willfully engaged in military

5    conduct with al-Qaeda in Syria, that that creates a significant

6    national security concern.

7          THE COURT:  Well, with an organization he believed was

8    al-Qaeda in Syria.  Because I think it was clear from the

9    testimony that there is no corroboration for that conclusion.

10         MR. BURWELL:  Your Honor, I'll proceed by proffer that

11   there is significant evidence corroborating his admissions.  And

12   I can direct Your Honor to the notion of the location where this

13   defendant in his admissions said that he was present.

14         I can also -- that he was in a certain part of Syria

15   engaged in military conduct there.  That that location, that

16   area of Syria is one that's dominated by Jabhat al-Nusra or

17   other jihadist groups.  So there is ample evidence to

18   corroborate his statement.

19         The videos that were referenced in the complaint, the

20   defendant himself says -- Mr. Kamens referenced the video about

21   the Free Syrian Army Jeep.  According to the defendant's own

22   words --

23         THE COURT:  Well, if he no longer has his passport and

24   he's placed on home detention with active GPS, it would make it

25   very difficult for him to actively participate with a terrorist

1    organization outside the U.S., wouldn't it?

2         MR. BURWELL:  Yes, Your Honor, it would be difficult,

3    but the Bail Reform Act does not direct to whether or not it's

4    difficult.  The question is whether or not he is a danger to the

5    community.  Given his -- the nature of the offense --

6         THE COURT:  Actually, that's not the final question.

7    That's the initial question.  The final question is whether or

8    not there are a combination of conditions of release that will

9    reasonably address that concern.

10        MR. BURWELL:  Yes, Your Honor.  And what is proposed

11   here is inadequate to address the government's severe concern

12   that this defendant poses a risk to the community and that the

13   conditions outlined are insufficient.

14        THE COURT:  Why?

15        MR. BURWELL:  Because the defendant knowingly,

16   willfully engaged --

17        THE COURT:  The Court completely understands the

18   charge.  An individual can confess to lots of charges.  It

19   doesn't mean that there are not a combination of conditions of

20   release that would reasonably address the Court's concern

21   regarding the safety of the community.

22        MR. BURWELL:  Your Honor, I'll continue with this.

23   That we have a -- it's a very significant, serious offense that

24   the defendant is charged involving a crime of terrorism by a

25   U.S. citizen.

1           THE COURT:   That's your complete argument then is what

2    you're saying?

3           MR. BURWELL:   No, Your Honor.

4           THE COURT:   That he's been charged with a very

5    significant offense; therefore, no combination of conditions of

6    release would reasonably assure his appearance at future court

7    proceedings or the safety of the community.

8           MR. BURWELL:   No, Your Honor.   I'd also like to -- I

9    haven't -- one of the -- the third factor that the Bail Reform

10   Act directs us to consider is the history and characteristics of

11   this defendant.

12          And it's the government's position that the nature of

13   the offense plus the weight of the evidence and this defendant

14   counsel against his release to the community at this time.   And

15   I will --

16          THE COURT:   Well, what history and characteristics of

17   him besides the charge --

18          MR. BURWELL:   Yes.

19          THE COURT:   -- would militate against his release?

20          MR. BURWELL:   That he is a trained U.S. soldier.   That

21   he has engaged in violent activity recently.   That he has a

22   lengthy --

23          THE COURT:   So if this Court is to conclude anytime a

24   veteran walks into this Court charged with an offense, the fact

25   that they're a veteran means that that characteristic militates

1    towards them being detained?

2          MR. BURWELL:  No, Your Honor, and in no way do I mean

3    to imply that.  What I mean to imply is that this defendant,

4    these are characteristics of this defendant that raise concerns

5    to the government apart from the specific nature of the charge.

6          Let me continue, please, about his lengthy history of

7    international travel and travel not always under his passport as

8    Mr. Kamens suggested.  We have him knowingly seeking out areas

9    of significant concern, including Egypt, Lebanon, and Palestine,

10   including with the assistance of terrorist organizations.

11         THE COURT:  Do you have any information that will

12   suggest that he has at any time in the past attempted to leave

13   the United States under an assumed name?

14         MR. BURWELL:  Your Honor, if I may.  No, Your Honor.

15         THE COURT:  All right.

16         MR. BURWELL:  We -- defense counsel approached on an

17   issue which the government believes is very relevant to this

18   defendant and his potential release into the community, a issue

19   that the defendant has had for an extended period of time.

20         At defense counsel's request, you know, this is a

21   matter of public record that the defendant has -- it's a matter

22   of public record that this --

23         MR. KAMENS:  I would ask that this matter be done at

24   the bench, Your Honor.

25         THE COURT:  No need.  The Court understands exactly

1   what you're talking about.

2           MR. BURWELL:  Once --

3           THE COURT:  That's why there's a recommendation in the

4   report to address that concern.  Why would not that

5   recommendation address the Court's concern concerning that

6   characteristic of this defendant?

7           MR. BURWELL:  Because that recommendation has

8   previously been made by other courts and it has been repeatedly

9   ignored by this defendant.

10          THE COURT:  And if that were to occur here, the Court

11  would have an absolute right to revoke any order releasing him,

12  wouldn't it?

13          MR. BURWELL:  Yes, Your Honor, if he did -- if he

14  ignored this Court's directions as he has previously ignored

15  other courts' and doctors' directions.  That this defendant --

16          THE COURT:  Where is the information concerning the

17  fact that he has failed to follow the orders of other courts in

18  that regard?

19          MR. BURWELL:  That's information that the government

20  has.  And if it's not included in the presentence report,

21  perhaps we should -- we should seek further information on that

22  subject.

23          THE COURT:  Do you have information that suggests that

24  or not?

25          MR. BURWELL:  I have information that this defendant

1    has had repeated run-ins with the authorities since 2000.  That

2    these run-ins have been based on infor -- based, in part at

3    least, on the defendant's personal issues.  And that --

4         THE COURT:  And in those situations, did a court

5    affirmatively order him to conduct himself in such a way and

6    then subsequently to that order he failed to do so?

7         MR. BURWELL:  Your Honor, I need to look further into

8    that.  I just -- the defendant has a history of problematic

9    interactions based on his own personal issues.  And in light of

10   that, in light of what the -- and I want to -- defense counsel

11   made a point that this defendant voluntarily appeared regularly

12   on behalf of his -- when agents were interacting with him in

13   Turkey.

14        And I can -- I need to stress that those interactions

15   were not easy, were not -- that the defendant was not always --

16   did not always appear when he was requested to appear in light

17   of his other activities.

18        THE COURT:  Well, if that were the case and he had

19   confessed to such a significant offense, which you've noted

20   numerous times during your argument, why was he not arrested

21   after the first encounter with law enforcement, after the second

22   encounter, after the third encounter, after the fourth encounter

23   if you believe that he was such a danger based on the offense

24   that he committed and the interactions with law enforcement

25   during their investigative interviews?

1          MR. BURWELL:  Well, there were a few challenges.  One

2   is he's in Turkey.

3          THE COURT:  People are extradited from overseas all the

4   time.

5          MR. BURWELL:  Yes, Your Honor, but the United States

6   doesn't have arrest authority overseas to arrest an individual.

7   When the defendant traveled back to the United States, he was --

8   FBI agents were with him at all times.  He was on the no-fly

9   list, and it was only after significant effort to remove him

10  from that list for a one-time waiver so that the FBI agents

11  could escort back to the United States.

12         THE COURT:  Do you have any information that suggests

13  that he actively participated with a terrorist organization

14  subsequent to any of his interviews or subsequent to contact

15  with law enforcement or authorities in Turkey?

16         MR. BURWELL:  With the terrorist --

17         THE COURT:  Correct.

18         MR. BURWELL:  -- expressly, no, Your Honor.  We do have

19  information that he was attempting to purchase weapons for rebel

20  groups.  That -- but not specifically the terrorist.

21         THE COURT:  Would that be illegal or a violation of

22  U.S. law?

23         MR. BURWELL:  Absolutely, Your Honor.  Let me -- a few

24  other facts to bring to the Court's attention.  With regard to

25  the issues that defense counsel raised at sidebar, the defendant

1    did actually acknowledge that he does not regularly abide by the

2    regimen that was prescribed to him.

3         There is -- it's also important to note what this

4    defendant said that he intended to do.  He intended to travel to

5    Palestine and that he intended -- he was willing and able and

6    anticipated that he would take up arms there against the

7    Israelis following this exchange in Syria.  And he has --

8         THE COURT:  He's confessed to that?

9         MR. BURWELL:  Yes, Your Honor.  He said that that's

10   what he intended to do after being expressly advised that he

11   should not return to Syria.  That's this defendant.  For all of

12   these reasons, the government believes that an order of

13   detention is necessary at this time.

14        And that in light of all of these issues, the severity

15   of the charge here, the strength of the government's case, that

16   the government does not -- that a U.S. citizen knowingly aligned

17   himself with al-Qaeda is perhaps one of the most grave and

18   serious threats to national security that the United States

19   government can countenance, can see.

20        We see this is not an event that regularly occurs.  And

21   when that happens, the United States government must investigate

22   and pursue all potential avenues before there can be any --

23   before we're able to represent to the Court that he is not a

24   danger to this community.

25        Your Honor, I would appreciate the opportunity to

1    respond to anything from Mr. Kamens.

2         MR. KAMENS:  Your Honor, one of the first questions I

3    asked Mr. Higginbotham was whether Mr. Harroun had ever, to the

4    government's knowledge, engaged in any terrorist activity or

5    whether there was any evidence that he had any fundamentalist or

6    jihadist views, and the answer to those questions is no.

7         And it's particularly pertinent here because given the

8    nature of the charge, given the government's arguments, the

9    Court has to be concerned with, in a weapons charge, what is the

10   weapon and where did the defendant want to point it.

11        If this defendant had engaged in a conspiracy with

12   members of al-Qaeda in Pakistan to possess a nuclear or

13   biological or chemical weapon, that would have a particular

14   impact, I would imagine, to this Court's detention decision,

15   because the weapon itself is extraordinarily dangerous and the

16   desire of the organization about where that weapon should be

17   pointed is directly at the United States, but that is not this

18   case.

19        What we have here --

20        THE COURT:  RPGs are very destructive weapons too.

21   That's why they're used.

22        MR. KAMENS:  That's certainly true, but they are

23   conventional weapons regularly used in conflicts around the

24   world.  They are of a different character than chemical,

25   biological, nuclear weapons, which are independently prohibited

1  from being used in conflicts.  We're talking about

2  run-of-the-mill weapons --

3          THE COURT:  So he's not a danger to the community

4  because he never intended to use a biological or nuclear weapon?

5          MR. KAMENS:  I'm just suggesting, Your Honor, that the

6  charge itself, possession of a weapon of mass destruction,

7  encompasses a wide range of conduct.  And there is a grave

8  difference between the conduct that is alleged here and the

9  conduct that also encompasses conduct proscribed by the charge,

10  not that --

11          THE COURT:  Are you arguing that possession of an RPG

12  was not a weapon of mass destruction?

13          MR. KAMENS:  No.  It is -- by definition it is a weapon

14  of mass destruction.  What I'm saying is is that there are

15  different flavors of weapons of mass destruction.  And the type

16  of weapon that we're dealing with here is not a weapon that is

17  at the highest level of weapons that are encompassed by the

18  statute.  I don't want to overstate --

19          THE COURT:  Depends on what you point it at.

20          MR. KAMENS:  Absolutely.  And I think --

21          THE COURT:  If you point it at a bus full of a hundred

22  people which is full of gasoline, it would have a significant

23  dramatic impact.

24          MR. KAMENS:  Absolutely.  And certainly if it were

25  pointed at civilians, that would constitute a terrorist act.

1   That's precisely why it's very important for the Court to

2   consider the allegations here.  That Mr. Harroun was not engaged

3   in terrorism --

4           THE COURT:  But it was pointed at civilians, wasn't it?

5           MR. KAMENS:  No, Your Honor.  As I understand it, and

6   the testimony from the witness, is that Mr. Harroun was engaged

7   in fire fights against combatants, not --

8           THE COURT:  They're civilians.  No, not -- it's the

9   Syrian government, right?

10          MR. KAMENS:  Armed fighters.

11          THE COURT:  Who has defined those individuals as

12  combatants?  Is the Syrian government defined as combatants

13  pursuant to U.S. law?

14          MR. KAMENS:  I don't think there's any claim, and I

15  don't want to speak for the government, I don't think there's

16  any claim that Mr. Harroun was engaged in combat against

17  civilian fighters.  It was either the Syrian Army or Shabiha

18  which are militia employed by the Syrian government.  That is,

19  it would be a war crime for an individual to engage in combat

20  against civilians, but that's not the claim here.

21          The claim here is simply that Mr. Harroun was engaged

22  in a fire fight, or several, with rebel groups in Syria against

23  Syrian fighters.

24          THE COURT:  So if he's off the ground in the U.S.

25  shooting military personnel, that would be okay because they're

1    combatants?

2         MR. KAMENS:  No, Your Honor, but -- of course not.

3         What I'm suggesting is is that there's a difference

4    between an allegation that Mr. Harroun was engaged in terrorist

5    acts, which I don't think there's any allegation that he was,

6    and an allegation simply that he was engaged in combat in a war

7    zone in Syria against combatants.  That has a different import

8    than the allegations here.

9         THE COURT:  I think the government did argue because

10   they said that 2232a is a crime of terrorism.

11        MR. KAMENS:  That's what they said.

12        THE COURT:  That's why it's a presumption case.

13        MR. KAMENS:  And that's right, absolutely,

14   definitionally.  Under the law it is considered -- under this

15   statute where it is defined as a presumption case, it is

16   categorized as a definitional matter.  But the Court has to

17   consider the nature of the allegations, and I'll get to those in

18   just a moment, but it is very different.

19        The fact that it's characterized as a definitional

20   matter under the law is very different from the allegations

21   which are that he was simply a combatant against other

22   combatants.

23        THE COURT:  What about the representation by government

24   counsel that he confessed to intending to go to Palestine to

25   fight against Israelis?

1        MR. KAMENS:  Your Honor --

2        THE COURT:  That would not be lawful, would it?

3        MR. KAMENS:  No, it would not be lawful.  And, Your

4    Honor -- well, first, I would object to the moving target nature

5    of the government's allegations here.  I mean, we're talking

6    about a charge that's listed in the affidavit and the complaint

7    and then we're shifting to his affiliation with this known

8    terrorist group, which is the government calls al-Qaeda now, and

9    then the allegations that Mr. Harroun may have said he intended

10   to go to Palestine at some indefinite future point.  Mr. Harroun

11   denies ever engaging in any violent act or intention to go to

12   Palestine or anything else.

13        The Court has to consider now whether there are any

14   combination of conditions that will reasonably assure the safety

15   of the community and that he will appear at future court

16   appearances.  And under the circumstances, we concede that this

17   is a presumption case, but that only shifts the burden of

18   production to the defense.  The burden of persuasion for that

19   final question, as the Court stated earlier, is on the

20   government.

21        And if there is any case where the government can bring

22   the charge of possession of a weapon of mass destruction where

23   the defendant should be given release, this is it, because we're

24   not dealing with those weapons that I mentioned earlier.  We're

25   dealing with a conventional weapon in which Mr. Harroun was

1  engaged in combat against a regime that the U.S. government

2  itself opposes.

3        The presumption in favor of detention in this case

4  should not preclude the government or preclude the Court from

5  finding that the conditions that are listed in the pretrial

6  services report are adequate to reasonably assure the safety of

7  this community precisely because the Court has to consider not

8  just the nature of the charge, but what is the intent of the

9  defendant, and there is zero information presented in this court

10  this morning to suggest that Mr. Harroun is any threat to the

11  United States, to individuals in the United States, to anything

12  that is against U.S. interests.

13        THE COURT:  Well, fighting against Israelis with the

14  Palestinians would be against the U.S. interest, wouldn't it?

15        MR. KAMENS:  That it would, absolutely.  But, Your

16  Honor, some random statement that Mr. Harroun may have said at

17  some unknown time about some indefinite plan in the future is

18  not a valid basis for the Court to find that there are no

19  conditions that will reasonably assure the safety of the

20  community.  It simply does not mean that he is a threat to

21  anyone in the United States.

22        THE COURT:  By itself it may not be sufficient --

23        MR. KAMENS:  Certainly.

24        THE COURT:  -- but we have a lot more than that

25  statement.

1          MR. KAMENS:  Certainly.  And the Court has to consider

2     whether Mr. Harroun poses such an insurmountable threat to

3     people in the United States or such an insurmountable risk of

4     flight that the Court can't consider any other option but

5     detention, and we suggest that's not appropriate here.

6          The Court understands the factors, the nature and

7     circumstances of the offense, the weight of the evidence, and

8     the history and characteristics of Mr. Harroun.

9          If I can speak about the nature of the offense charged,

10    I would like to focus first on the lack of -- or the imprecision

11    with which the government uses its language about the

12    organization that Mr. Harroun was alleged to be affiliated with.

13         The government says that it was al-Qaeda and that

14    Mr. Harroun was joining al-Qaeda in Syria.  First, there's zero

15    information that Mr. Harroun was ever told when he was in Syria

16    that Jabhat al-Nusra was an alias of al-Qaeda in Iraq, which is

17    different from al-Qaeda in Pakistan; and, secondly, there's no

18    information that Mr. Harroun has any interests that are aligned

19    with al-Qaeda.

20         In fact, it's in the complaint that Mr. Harroun said to

21    the government quite openly he opposes al-Qaeda, he opposes

22    oppression, and he would fight against any effort to impose such

23    oppression in Syria.

24         THE COURT:  So now we're talking about the differences

25    in scales between terrorist organizations.  One's worse than the

 1   other.

 2          MR. KAMENS:  Well, yes, because of the focus of the

 3   organization.  If an organization is simply focused on Syria or

 4   fighting against the Bashar al-Assad regime, that is different

 5   from an organization that is focused on killing Americans or

 6   bombing embassies, U.S. embassies, or imposing, you know, some

 7   violence against the United States.  That's a completely

 8   different allegation.

 9          And what I'd suggest is is that not that the charges

10   here aren't serious, but that there is a very distinct

11   difference between the allegation that Mr. Harroun joined

12   al-Qaeda and the allegation that he fell in with a group of

13   rebel fighters who are listed in December, one month before

14   Mr. Harroun went to Syria, as an alias for al-Qaeda in Iraq.

15          THE COURT:  But he actively and knowingly and

16   intentionally participated with an organization that he knew had

17   been designated by the United States as a terrorist

18   organization.

19          Does that not tell the Court something about his state

20   of mind and therefore part of his history and characteristics?

21          MR. KAMENS:  It depends on -- well, of course it does,

22   but the Court has to consider what he is assisting them in

23   doing.  If they were preparing a bomb or preparing a plan to

24   attack U.S. interests, that would be one thing.

25          THE COURT:  Well, it's the Court's understanding that

1    aiding and abetting any organization designated as a terrorist

2    organization by the United States would be unlawful.  So he

3    knowingly and actively participated in what he knew was unlawful

4    activity based on U.S. law.

5        MR. KAMENS:  And Your Honor may be referring to the

6    material support decision by the Supreme Court in 2010,

7    *Humanitarian v. Holder*, where they said that even nonviolent

8    support, even food aid for an organization that's been

9    designated as a terrorist organization can constitute material

10    support.  But it's obvious that the United States government

11    provides nonlethal support to the rebels in Syria.

12        And so if that definition of material support were

13    applied in the context of Syria, it raises a host of questions

14    about the U.S. policy that's openly engaged in there.

15        THE COURT:  This Court isn't here to determine whether

16    U.S. policy concerning Syria is appropriate or inappropriate.

17    That has nothing to do with whether or not your client is a risk

18    of nonappearance at future court proceedings or a danger to the

19    community.

20        MR. KAMENS:  What we're talking about is danger.  And

21    what I'd suggest to the Court is the fact that Mr. Harroun's

22    stated goal and the conduct on the ground was aligned with the

23    U.S. interest changes the equation from this case from any other

24    case involving these types of charges.

25        You know, the United States has charged American

1  citizens.  In World War II, individuals who were found fighting

2  for Italy or for Germany or more recently with the Taliban, it

3  has charged those individuals with criminal offenses.  Never, to

4  my knowledge, has the United States ever charged an American

5  citizen for fighting alongside a group that is aligned with the

6  U.S. interest, and that changes the equation with respect to the

7  consideration and evaluation of the danger to this community.

8           THE COURT:  But this Court can't conclude that those

9  interests will always be aligned with the U.S. interests, can

10  it?

11           MR. KAMENS:  That's --

12           THE COURT:  The U.S. interest was assisting the Taliban

13  against the Russians now, wasn't it?

14           MR. KAMENS:  Absolutely.

15           THE COURT:  That interest surely changed.

16           MR. KAMENS:  It certainly did.  But I don't believe

17  there was any prosecution of anyone, including members of the

18  U.S. government, who assisted in providing Stinger missiles to

19  the Taliban.  The question --

20           THE COURT:  Because they're the U.S. government.

21           MR. KAMENS:  Certainly true.  And the question for the

22  Court is not necessarily what it could speculate about

23  Mr. Harroun's intentions in the future, but whether there are

24  conditions that would alleviate the Court's concerns about the

25  danger now.

1          THE COURT:  I'm not speculating about his intentions in

2     the future.  He confessed to what his intentions in the future

3     were, to go to Palestine and fight against the Israelis.

4          MR. KAMENS:  And under 3142(f), we're allowed to

5     proffer and I would proffer to the Court that Mr. Harroun has

6     zero intention to go to Palestine or anywhere else to engage in

7     any kind of combat.

8          The Court obviously has to consider every piece of

9     information that its heard here, but it also has to consider the

10    nature of the allegations that form the heart of this complaint.

11         What the government stands up here and says to the

12    Court is because he affiliated with this terrorist organization,

13    therefore necessarily he is a threat to the community here.  And

14    the problem is is that allegation, this affiliation, in combat

15    against the Bashar al-Assad regime, does not equal a threat to

16    anyone in this country, because Bashar al-Assad does not live

17    here and there is no one else that anyone has said that

18    Mr. Harroun sought to be involved in combat against who is

19    threatened by his presence here outside of detention.

20         THE COURT:  And do you have legal authority for the

21    conclusion or the representation that danger to the community as

22    set forth in Title 18, United States Code, Section 3142 only

23    applies to the United States community?

24         MR. KAMENS:  Well, I think it's narrow, more narrow

25    than that.  I think it's the community to which he would be

1  released to.

2      THE COURT:  And where is your legal authority for that?

3      So if I had -- if I believe or sufficient information

4  was provided to this Court that if he were released he would go

5  to Arizona and kill his mother, that's okay because we're

6  talking about the Eastern District of Virginia's community

7  safety.

8      MR. KAMENS:  Oh, no, no, no.  If he was released to

9  Arizona, of course the Court would be concerned about that.  I

10 think I understand the Court's question.

11     Let's say that there was some information that

12 Mr. Harroun wanted to travel to Japan and harm someone in Japan,

13 would that be something that the Court would consider in

14 evaluating danger to the community.  I would suggest that

15 consideration would be properly considered under risk of flight

16 and not danger to the community.  The community he's released to

17 is the community he's released to.

18     Does he have some overriding interest and desire to

19 travel to Japan and leave this jurisdiction and harm someone

20 there, well, that's a separate consideration.  Is he and does he

21 have some incredible risk that he will leave this area and not

22 appear in the future, that's not what we have here.

23     THE COURT:  Once again, the question remains do you

24 have legal authority for the position that this Court really

25 shouldn't concern itself with his danger to anyone outside the

1    United States?

2           MR. KAMENS:   I am happy --

3           THE COURT:   The Court turns a blind eye to the safety,

4    the health and safety of non-U.S. citizens.

5           MR. KAMENS:   Outside of the United States.

6           THE COURT:   Outside of the United States.

7           MR. KAMENS:   I'm happy to provide legal authority for

8    what I recall seeing, and that is that the Court must be

9    concerned with the community to which the defendant would be

10   released.  And I don't recall any case that has ever suggested

11   that the Court considers under dangerousness to the community

12   individuals who are outside the United States.

13          I just -- maybe there's -- maybe there is a case.  I

14   don't recall ever seeing such authority.  But in any event, the

15   Court can certainly consider whether there's evidence that

16   Mr. Harroun would flee the jurisdiction and not appear as he's

17   required.  And the information before the Court, I think, is all

18   about danger and nothing about risk of flight.

19          The government says that Mr. Harroun has a history of

20   not complying with court orders.  The evidence before the Court

21   is to the opposite.  That is that he was given probation in one

22   of his prior cases, a misdemeanor, in Tucson, Arizona, in 2009,

23   and he was actually terminated early because of his compliance

24   with the orders that were imposed by the Court.

25          The government's statements that he hasn't complied

with court orders simply are not supported by anything in the record.

With respect to -- and let me state further I don't believe that the Court should consider -- let me say that's on page 4 of the original pretrial services report, Your Honor, with respect to his early termination for compliance.

The government also says that Mr. Harroun has incited up to 300 others to join the fight in Syria.  I'm not sure where they get that number.  I imagine it's probably from the number of Facebook friends that Mr. Harroun has and which he details his exploits.

Mr. Harroun denies ever inciting anyone else to engage in combat in Syria.  And I would invite the government to provide any information at all to suggest that he has done anything to incite others to engage in violence overseas.

He's a veteran which I suggest should weigh in favor of release.  He's 30 years old and was given an honorable discharge in 2003.  His employment history includes working for a restaurant, a car dealership, and a mortgage company in Phoenix, Arizona.  He has no felonies.  He has DUIs dating from 2005 and 2007, but he was actually terminated early, as I mentioned, from the 2007 probation.  It certainly shows that at least he has some history of complying with court orders.

We have a viable third-party custodian, his mother, who is willing to ensure that he abides by the conditions of

1    release.  And the government says that there may be some history

2    of having a restraining order.  Well, first, I think the

3    government's information is certainly old and, secondly, comes

4    from information in a Skype chat.  That is hardly the type of

5    reliable information the Court should rely upon.

6         The most -- the best information the Court can rely

7    upon is the interview that pretrial services has had with

8    Mr. Harroun's mother, and she is willing to serve as a

9    third-party custodian and make sure that Mr. Harroun appears as

10   he is required and abides by the conditions of the Court.

11        THE COURT:  Well, it's the Court's understanding, and

12   maybe the Court's wrong, that the information concerning the

13   domestic issues or problems with his mother came from

14   Mr. Harroun.

15        MR. KAMENS:  In a Skype chat.  And I've spoken with

16   Mr. Harroun.  We would proffer he doesn't recall any restraining

17   order ever.  That the arrest which didn't result in convictions

18   in this case do not involve his mother.

19        But, Your Honor, at any event, the best information the

20   Court can rely upon is the pretrial services interview.

21   Mr. Harroun's mother is very willing to provide a home and serve

22   as a third-party custodian.  And the government's indistinct and

23   imprecise information about some temporary restraining order at

24   some undefined time in the past is not a sufficient basis to

25   find that she wouldn't be a sufficient third-party custodian.

1         Let me talk briefly about the weight of the evidence

2 because the government emphasized that.  First, it's the least

3 important factor, as the Court knows, because of the presumption

4 of innocence.  But the fact is, as the Court heard from the

5 testimony here, that their entire case essentially relies upon

6 the word of the defendant alone.

7         There is no video showing use of RPG like I would

8 proffer to the Court there is.  You can look up on YouTube and

9 put in Matthew VanDyke and see another American in Libya firing,

10 actually firing an RPG in a video.

11         THE COURT:  So your client's four confessions is not a

12 lot of evidence?

13         MR. KAMENS:  Your Honor, I would say that under the

14 *corpus delicti* rule, typically a defendant's confession alone is

15 not sufficient for them to be found guilty of an offense.

16         THE COURT:  Alone.

17         MR. KAMENS:  That's correct, Your Honor.

18         THE COURT:  They have more than just his confession.

19         MR. KAMENS:  They have information that he was in the

20 place that he said he was.  When the witness was asked whether

21 there was any information about the weapons that he's pictured

22 with actually function, the witness said, no, we have no

23 information.  They're just pictures.

24         What else do they have?  They have the defendant's

25 statements from Facebook.  They have interviews with the press.

 1   They don't have an actual video of Mr. Harroun engaged in actual

 2   combat with a weapon of mass destruction.

 3        THE COURT:  Well, if that would be required in every

 4   case, we would have a lot of people who will be found not

 5   guilty.

 6        MR. KAMENS:  It's certainly --

 7        THE COURT:  Unless the Court is incorrect and the law

 8   has changed, a confession corroborated by a scintilla of

 9   evidence is sufficient to prove an individual's guilt beyond a

10   reasonable doubt.

11        MR. KAMENS:  Under the *corpus delicti* rule, I believe

12   that's correct, Your Honor.  But, Your Honor, under the ordinary

13   circumstance, we're dealing with an investigation in a typical

14   case in the United States where the government is easily able to

15   confirm the information that they've obtained from a defendant

16   in a confession.

17        What we have here is information about what happened in

18   a war zone.  We don't have the weapons.  All we have is pictures

19   and the defendant's statement.  I would suggest that

20   comparing --

21        THE COURT:  What about all the information they're

22   getting off of his phones, the videos and things?

23        MR. KAMENS:  None of that shows that he actually used a

24   weapon of mass destruction, Your Honor, or would have used a

25   weapon --

1      THE COURT:  But if it corroborates other statements he

2  made, that can go for the Court determining that all the

3  statements he made were accurate.  So what you're saying is the

4  Court should believe him some of the time and not believe him

5  others.

6      MR. KAMENS:  What I'm suggesting is is that the Court

7  should weigh the weight of the evidence in this case as it would

8  against a typical case in which the government typically has the

9  weapon itself, can prove to the Court or show anyone in the

10  world that, hey, this is actually something that works as

11  opposed to just a picture and the defendant --

12      THE COURT:  We've had people convicted of murder

13  without a body.

14      MR. KAMENS:  Certainly.  And we're talking about maybe

15  apples and oranges here.  I am not suggesting that there is no

16  way the government could overcome their burden.

17      What I am suggesting is that the Court should consider

18  the weight in this case compared to the weight in many other

19  cases, which is far stronger and involves actual possession of a

20  weapon, involves actual corroboration of what the defendant

21  says.

22      It may be true, as the Court intimates, that the

23  government can overcome the burden that it would have to

24  overcome at a trial, but that does not mean that at this point

25  the weight of the evidence in this case is strong in comparison

1  to the weight of evidence that the Court sees on a daily basis.

2          I would also point the Court's attention to the

3  language in the statute which says that the defendant's

4  possession of this weapon must be without lawful authority.

5  Now, if the government wants to be in the position of saying

6  that Bashar al-Assad is the lawful authority in Syria and that

7  all of the rebel groups fighting against him are criminals, they

8  may be put in that position, but I think that would be at

9  distinct odds with their ordinary position by the United States

10 government, and that is the one that has been accepted by, I

11 think, scholars of international law, and that is that this is a

12 non-international armed conflict in which the rebels have the

13 right to fight against this regime.  And if they do, then they

14 have the right to issue conventional weapons, not biological or

15 chemical or nuclear, but conventional weapons to their fighters.

16 If that's so, then Mr. Harroun has not committed the offense to

17 which he is charged.

18         THE COURT:  If he were only assisting the Free Syrian

19 Army.  If he is assisting an organization designated by the

20 United States as a terrorist organization, that would not be

21 lawful.

22         MR. KAMENS:  Certainly, and that's a separate charge

23 that they haven't alleged in the complaint.  But, you know, I

24 think there's separate problems with respect to material

25 support.  But to be very clear, the government has charged and

1    is asking the Court to detain Mr. Harroun because of the charge

2    that's listed in the complaint and the probable cause to which

3    the Court found.

4        With respect to the overall question, as I mentioned,

5    Mr. Harroun has traveled predominantly, if not exclusively,

6    under his own name overseas using his own passport.  That's why

7    the government is able to present the information about his

8    travel because he not only has traveled under his own name, but

9    according to the government, he actually told them where he was

10   going.  And when he came back from Syria, he actually knocked on

11   the door of the U.S. consulate in Istanbul.

12       That changes the equation of dangerousness, I would

13   suggest, because this is not a case in which the government is

14   silently tracking an individual believing that he is a jihadi,

15   an Adam Gadahn, someone who may be a threat to the United

16   States.

17       We're talking about someone who came to the United

18   States and voluntarily engaged in interviews, not once, not

19   twice, not three times, but four times outside of custody.  That

20   changes the equation of dangerousness in this case.

21       As I mentioned --

22       THE COURT:  Why?

23       MR. KAMENS:  Because --

24       THE COURT:  Because your client may not have been

25   intelligent enough not to confess to crimes?

1          MR. KAMENS:  Because it shows that his intent is to be

2    cooperative and not to hide anything from U.S. authorities.

3          THE COURT:  That doesn't make him any less dangerous.

4          MR. KAMENS:  I believe it does.  The government's whole

5    point is that --

6          THE COURT:  The Court would disagree.

7          MR. KAMENS:  I appreciate and ultimately the Court's

8    view is much more important than my own.  But my argument to the

9    Court is that someone who is not hiding what they're doing from

10   the U.S. government is far less a threat to the U.S. government

11   than someone who does hide that information.  Why?  Because the

12   government is then able to understand and monitor that

13   individual and determine whether they actually are a threat.

14   The whole point of the conspiracy law is because the government

15   is concerned about individuals working in silent and in private

16   against legitimate government interests.

17         Here we have an individual who is open on Facebook and

18   directly to U.S. government officials about what he's doing.

19   That is more than just naiveté.  That is more than just a lack

20   of intelligence that what he's doing may violate the law.  It is

21   someone who intends to be cooperative and not in any way at all

22   threaten United States interests, and ultimately that is what

23   the government is saying here, that Mr. Harroun --

24         THE COURT:  There are individuals who conspire to sell

25   drugs on multi-kilogram bases and then confess to the government

1    makes them no less dangerous to the individuals who they sold

2    the drugs to.

3         MR. KAMENS:  Generally not before they're charged with

4    an offense.  In this case that happened four times.

5         THE COURT:  The Court has seen plenty of people confess

6    to offenses before they've been charged.

7         MR. KAMENS:  Well, generally, when they're arrested and

8    they're confronted by law enforcement.  I would say suggest that

9    this is a very different circumstance.  It is very different for

10   someone to engage in a multi-kilo drug offense and then knock on

11   the door of the local police station and say, you know what I

12   just did, I just engaged in a multi-kilo drug transaction.  That

13   never happens unless the person is mentally challenged.

14        This is a very different set of facts than your typical

15   case, I would suggest.  As I mentioned, the allegations here are

16   unique and I would say unique in American law because it is

17   something that is extraordinarily unusual for the government to

18   charge someone, a U.S. citizen, who is fighting in a manner that

19   is aligned with the U.S. interest, and I would suggest that that

20   changes the equation of detention.  And as I mentioned at the

21   beginning, that this involves a relatively conventional weapon,

22   not a weapon in chemical or biological or nuclear nature.

23        In sum, the allegations in this case do not support the

24   claim that Mr. Harroun is a threat to anyone now or in this

25   country.  And we would ask that he be released under the

1  conditions that are listed in the pretrial services report.

2  It's important that in a case of this nature, the pretrial

3  services office has recommended that Mr. Harroun be released.

4      And I think it's because the recommendation reflects

5  the difference between this case and every other case involving

6  charges of a similar nature.  We'd ask that he be released under

7  home detention with GPS, third-party custodian, and counseling

8  as required by the pretrial services office.

9      THE COURT:  Is there anything further?

10     MR. BURWELL:  Your Honor, very briefly.  The difference

11  is that al-Qaeda in Iraq is not aligned with U.S. interests in

12  Syria, and this defendant aligned himself with al-Qaeda in Iraq.

13  That is the critical difference here.  This defendant knowingly,

14  willfully engaged in military conduct with a designated

15  terrorist organization.

16     That's what makes him an incredible danger to the

17  United States, to the community, and his desire to continue to

18  do this and to pursue violent activity wherever it may lead him.

19     The last point is that this -- the government submits

20  that this third-party proposed custodian is not a viable

21  custodian because of the information that the defendant himself

22  stated, and that this exchange prior to his returning to the

23  country showed that even the defendant and his mother agreed

24  that this wasn't -- she was not a good custodian.

25     There is a history of challenges and problems with this

1    defendant, a long history, and because of that and because of

2    his decision to affiliate with a group who's committed to the

3    destruction of the United States of America, he should be

4    detained at this time.

5           Your Honor, unless you have further questions.

6           THE COURT:   The Court would have tended to concur with

7    defense counsel that the combination of conditions of release

8    set forth in the addendum to the pretrial services report would

9    reasonably address this Court's concern regarding a risk of non

10   appearance by Mr. Harroun as well as a danger to the community,

11   tended to concur if this were not a presumption case.   That

12   changes the playing field.

13          And Mr. Harroun is required to produce sufficient

14   evidence to this Court to show this Court that there are a

15   combination of conditions of release that will reasonably assure

16   his appearance.   As the government has noted, the Court has to

17   take into consideration the weight of the evidence, the nature

18   of the charge, his history and characteristics.

19          The Court would disagree with defense counsel that this

20   is not a case in which the weight of the evidence is strong.

21   There is no stronger case than the defendant's own confession.

22   He's confessed not once, not twice, not three times, but four

23   times.   His confession is partially corroborated by the

24   information on his own Facebook page, as well as it appears to

25   be corroborated or will be corroborated soon based on

1   information from his telephone, videos, and the like that are

2   recorded thereon.

3          He is also, the Court has -- or the government has

4   noted that he has provided information to suggest that he was

5   continuing to engage or attempting to engage in illegal conduct

6   even after the confessions to law enforcement or government

7   authorities, that being the purchase and/or possession and

8   transfer or distribution of other weapons.  He specifically

9   confessed to the fact that he would be -- it was his intention

10  to go to Palestine to fight against the Israelis which would not

11  be in the United States interest.

12         But the Court is going to make it clear now what either

13  defense counsel or the government believes is in the United

14  States interest is not, this Court believes, an appropriate

15  consideration in determining whether Mr. Harroun should be

16  released or not.

17         The United States interests change.  Years ago it was

18  in the United States interest not allow women the right to vote.

19  That would have been inappropriate.  It was in the United States

20  interest to have African-Americans and white Anglo-Saxons

21  separated from one another in school, in the workplace, and

22  other places.

23         So the Court does not believe that the United States

24  interest or what the United States says its interest is

25  regarding a foreign government is the appropriate consideration

1  in determining whether this defendant is a risk of nonappearance

2  at future court proceedings or a danger to the community.

3          There is information that he has -- he's been convicted

4  of failing to obey a police officer.  That is information that

5  was suggested to this Court that he may have some difficulty in

6  following this Court's orders.

7          We dealt with the issue at the bench concerning another

8  history and personal characteristics of the defendant, which

9  there is sufficient or significant information that shows that

10 he has failed to follow certain regimens even though he was

11 known -- even though he was told to do so, maybe not by a court,

12 but by someone else.

13         The major distinction here is if he were only fighting

14 with the Free Syrian Army, the Court could understand more, but

15 he actively, knowingly participated with an organization that he

16 knew had been designated by the United States as a terrorist

17 organization.  That makes him a dangerous individual.  Not only

18 did he participate, he bragged about it and then he confessed

19 about it on four occasions.

20         At this time the Court finds that there's no condition

21 or combination of conditions of release that will reasonably

22 assure his appearance at future court proceedings and the safety

23 of the community based, again, in regards to appearance at

24 future court proceedings on the government's representation that

25 he may be facing a mandatory minimum of 30 years' imprisonment

1    and a maximum of life.  That provides a significant incentive

2    for one to not to appear at future court proceedings.

3            Mr. Harroun will be detained prior to further

4    proceedings.  He's remanded to the custody of the United States

5    Marshals.

6            MR. BURWELL:  Thank you, Your Honor.

7            THE COURT:  There being nothing further, this Court

8    stands adjourned.

9            * * *

10        (Proceedings concluded at 12:29 p.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2                          <u>CERTIFICATION</u>

3

4          I hereby, this 1st day of July 2013, that the

5   foregoing is a correct transcript from the recording provided by

6   the court.  Any errors or omissions are due to the inability of

7   the undersigned to hear or understand said recording.

8

9                           /s/
                  _____

10                  Tracy Westfall, RPR, CMRS, CCR

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25